# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6075 | **DATE** | 6/16/2003 |
| **CASE TITLE** | Christine Czemske vs. Eastman Kodak Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in this memorandum opinion and order, Kodak's motion for summary judgment is granted. (12-1) This action is dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | **JUN 17 2003** | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 19 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | | |
| SN | courtroom deputy's initials | 03 JUN 17 AM 8:00 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTINE J. CZEMSKE, )
)
         Plaintiff, )
)
v. ) No. 01 C 6075
)
EASTMAN KODAK COMPANY, )
)
         Defendant. )

MEMORANDUM OPINION AND ORDER

Christine Czemske ("Czemske") has charged her former employer Eastman Kodak Company ("Kodak") with sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e to 2000e-17). Czemske claims that a co-worker's conduct created a hostile work environment and that she was forced to leave Kodak because it failed to take adequate remedial action.

Kodak has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and both sides have complied with this District Court's LR 56.1.[1] For the reasons set forth in this memorandum

---

[1] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Kodak's LR 56.1(a) statement as "K. St. ¶--," to Czemske's LR 56.1(b)(3)(A) response as "C. Resp. St. ¶--" and to Czemske's LR 56.1(b)(3)(B) statement of additional facts as "C. St. ¶--," although where a "K. St." is not contradicted a citation to that submission suffices. "K. R. St." designates Kodak's reply statement. Those same "K." and "C." abbreviations are used in referring to the parties' memoranda and exhibits.

opinion and order, Kodak's motion for summary judgment is granted.

## Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). And Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

As with any Rule 56 motion, the Court accepts the nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. What follows in the Background section is culled from the parties' submissions in those terms.

## Background

Czemske was employed by Kodak or its subsidiary Qualex from 1994 to April 20, 2000 (K. St. ¶¶5, 9). She worked for Qualex from 1994 to 1996, when Kodak took control of the company (id. ¶¶4, 6). After working for Kodak from 1996 to 1998, she returned

2

to work at Qualex as a human resources representative (id. ¶5). Czemske was promoted from that position to a sales account representative position at Kodak on April 3, 2000 and remained there until her effective date of separation on April 20 (id. ¶¶8, 9).[2]

Czemske bases her sexual harassment claim on events that initially stemmed from actions taken by her co-worker Anthony Buongiorno ("Buongiorno"), who created two bogus images (reproduced here as K. Exs. F. and G) by digitally scanning Czemske's photograph from her identification card and then superimposing it onto the images of two female bodies in sexually provocative poses to create a crude composite (Buongiorno Dep. 21-22).[3] In 1998 Czemske first became aware that Buongiorno had used her identification card photograph to create the two images (K. St. ¶14). Czemske asked Buongiorno for the images, and even though he gave her the hard copies and the disk on which they

---

[2] Because the operative events leading to Czemske's termination occurred during 2000, any dates mentioned in this opinion without a year reference relate to that year.

[3] K. Ex. F depicts a woman leaning on a gas pump and holding the nozzle of a gas pump in a highly suggestive manner between her legs. She wears stiletto heels, bikini briefs and a shirt that is knotted above her bare midriff and below her partially exposed breasts. Text on the image reads "Full Service Only" and "Pumping Ethyl," a vulgar pun on the image's motifs. K. Ex. G portrays a woman bending over a motorcycle. Aside from black high heel shoes she is nearly nude, with the handlebar partially obscuring her exposed breasts. Czemske's face is superimposed on the images to create the impression that she is the woman depicted in each.

3

were saved, he did not erase the images from his computer's hard drive (C. St. ¶18).

Although Thomas Broderick ("Broderick") -- Kodak's Regional Manager and then (as later) the supervisor of Czemske's immediate supervisor -- disclaims his having done so (see, e.g., Broderick Dep. 21, 27), on the present motion Czemske's contrary version must be credited. Czemske testified (Dep. 52-57) that Broderick was not only present when Buongiorno first passed the offending pictures to Broderick and her immediate supervisor -- in her presence -- back in 1998, but that Broderick and her then supervisor Michael Sitarz ("Sitarz") joined in "laughing and joking about my head being on these bodies" (id. 53).[4]

Czemske did not report that incident to her supervisors (K. St. ¶15). But she explains that she understood she had to go to her supervisor Sitarz to do so -- and after all, both he and

---

[4] Kodak's counsel attempts to bowdlerize the record by removing that as well as other damaging or potentially damaging evidentiary submissions as to the 1998 incident through the absurd argument that they "are irrelevant" because they antedated Czemske's EEOC charge by more than 300 days (K. R. St. ¶¶1-9), and further because the incident was unmentioned in the Complaint, Counsel, who is highly experienced in federal employment litigation, has to know better. As to the first contention, it impermissibly confuses nonactionability with evidentiary inadmissibility -- a distinction that is particularly significant in hostile environment cases, where repeated conduct (often over a substantial period of time) is usually a critical factor (Nat'l R.R. Passenger Corp. [Amtrak] v. Morgan, 536 U.S. 101, 115-21 (2002)). And as for the second argument, counsel ignores the fundamental nature of federal practice as involving notice pleading rather than fact pleading.

Broderick were the ones who had not only observed the incident but had participated actively by laughing and joking about it (Czemske's Dep. 77-78, C. St. ¶9).[5] And with Kodak's human resources department in Atlanta reachable only by phone, and with Buongiorno having promised "that it wouldn't happen again," Czemske "didn't feel I needed to do anything else because I just wanted to put it behind me and get on with my work" (Czemske Dep. 77).

On April 3, during an in-house pizza luncheon that was held in recognition of Czemske's return to Kodak (Broderick Dep. 22), Buongiorno displayed K. Ex. F to Czemske's supervisors Thomas Broderick ("Broderick") and Michael Griffith ("Griffith") (K. St. ¶¶21-22), the latter of whom was Czemske's immediate supervisor (id. ¶23). Buongiorno invited Broderick to view Czemske's "business card" and suggested that it was appropriate for her Northern Indiana sales territory (id.). Broderick glanced at the image briefly and questioned its appropriateness for the territory (Broderick Dep. 24). Griffith also viewed K. Ex. F at Buongiorno's urging during the pizza luncheon (K. St. 22).[6]

---

[5] Again Kodak's counsel seeks to have that testimony written in vanishing ink for the same empty "reasons" referred to in the last footnote (K. R. St. ¶9), as well as by pointing to Broderick's conflicting testimony (id; Broderick Dep. 27-32), which must of course be discredited in the Rule 56 context.

[6] Czemske denies Kodak's claim that Griffith failed to appreciate the sexual nature of K. Ex. F at the time of the pizza luncheon. Czemske cites Griffith Dep. 28 to support her position

5

Shortly after Czemske finished a telephone conversation on another subject with Glen Lawson, a Kodak human resource representative based in Atlanta, Broderick walked into the room, gave Czemske two thumbs up and laughingly said "Nice business cards" (K. St. ¶12).[7] Buongiorno then entered the room and gave the two images to Czemske (id. ¶13). No one else was present when those things occurred (id. ¶16).

On April 17 Czemske reported the incident to Griffith, showed him both images and gave notice of her intent to resign (K. St. ¶26). Griffith recognized K. Ex. F from the pizza luncheon, but he had not seen K. Ex. G before April 17.[8] Griffith was "shocked" and recognized the sexual nature of the images after viewing them together (K. St. ¶28; Griffith Dep.

---

that Griffith immediately recognized the Exhibit's sexual suggestiveness. But that testimony says otherwise: After viewing K. Ex. F and K. Ex. G together on a later date, Griffith recognized a "sexual connotation" that had been "completely lost on [him]" the day of the pizza luncheon (Griffith Dep. 28), when he had not -- as he did at the April 17 meeting described later -- taken a close look at it.

[7] Though Broderick denies that (K. St. ¶40), Czemske's version stated in the text is credited for present purposes.

[8] Although Czemske contends that Griffith had "seen the photographs" (C. Resp. St. ¶26), it is clear from the record that until April 17 Griffith had seen only K. Ex. F (Griffith Dep. 23). Czemske's reference to her own Dep. 169 testimony in that respect is misleading, because her earlier testimony (Dep. 164) had been that Griffith said he hadn't seen pictures depicting her before, but "had seen the same images with someone else's head on them." So even with reasonable inferences in Czemske's favor, the version stated in the text controls.

28). Czemske was visibly upset and in tears during the meeting (C. St. ¶21). She informed Griffith that Buongiorno had created the images, a fact that Griffith had assumed but never corroborated (K. St. ¶27; Griffith Dep. 25).

Czemske did not ask Griffith to take disciplinary action against Buongiorno (K. St. ¶33). Nor did she request a leave of absence, transfer or another work arrangement where she would not come into contact with Buongiorno (id. ¶¶31-32). Griffith encouraged Czemske to take several days off to reconsider her decision to resign (C. St. ¶23). Griffith told Czemske that he planned to address the matter with human resources representative Kelly Daviss ("Daviss"), Broderick and Buongiorno (K. St. ¶35). But Czemske left Kodak after the meeting and never returned (id. ¶49).

Griffith promptly called Buongiorno to set up an interview and instructed him to cease all activities with the images (K. St. ¶37). Next he met with Broderick, who says he was "appalled" to learn about the more graphic K. Ex. G (id. ¶39; Broderick Dep. 31).[9] After consulting with Daviss, Broderick determined that the images violated Kodak's zero tolerance policy on sexual

---

[9] Remember, however, that according to Czemske Broderick had seen K. Ex. G back in 1998 and had taken no action then (see text at n. 4). But even with her version being credited, there is no dispute that when Czemske chose to complain about the matter, Kodak's reaction was swift and decisive.

7

harassment (C. St. ¶44).[10] On April 20 Broderick decided to terminate Buongiorno's employment (K. St. ¶42). Due to a holiday weekend, Griffith did not tell Buongiorno that he was fired until April 24, the Monday following the holiday weekend (K. St. ¶¶43-46).

On June 26 Czemske filed a charge of sexual harassment with EEOC. After she received a right-to-sue letter, she timely filed this action.

## Hostile Work Environment

Czemske claims that Buongiorno's conduct created a hostile work environment that constituted sexual harassment in violation of Title VII. To that end Czemske must show[11] that Buongiorno's conduct was severe or pervasive enough to create an objectively and subjectively hostile or abusive work environment (Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). Amtrak v. Morgan, 536 U.S. at 116, quoting Harris, 510 U.S. at 23,

---

[10] Kodak's sexual harassment policy has been submitted as K. Ex. E. That policy defines sexual harassment to include "display of offensive sexually-oriented pictures, posters, etc.," and it specifically establishes termination as a potential consequence of any violation.

[11] At this summary judgment stage, of course, Czemske need not "establish" or "prove" or "show" anything. Instead she must merely demonstrate the existence of a genuine issue of material fact to defeat Kodak's summary judgment motion. Although this opinion will nonetheless most frequently employ one of those quoted terms because that is the terminology used by the cited cases, this Court has consistently imposed that lesser burden on Czemske in testing her claims.

8

reconfirms the test:

> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

As to the subjective-belief component, Czemske has certainly provided enough evidence to create a factual issue. She was in tears when she brought the images to Griffith's office and told him that the images demeaned her (Griffith Dep. 27). Moreover, she feared that Buongiorno had showed the images to clients in her sales territory (K. St. ¶22). Nor is that subjective perception undermined by Czemske's failure to show that her work performance suffered during the two-week period between the pizza luncheon and her meeting with Griffith. As Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1455 (7th Cir. 1994) has quoted from King v. Hillen, 21 F.3d 1872, 1883 (Fed. Cir. 1994):

> That women who are the objects of discriminatory behavior because of their sex are able to maintain satisfactory job performance is not grounds for denigrating their concerns.

So Czemske's feelings of anxiety, humiliation and embarrassment suffice to meet the subjective element of the hostile environment test.

But Czemske has greater difficulty with the equally essential objective element--the question whether a reasonable person would find the work environment at Kodak to have been

9

hostile or abusive. Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)(citations omitted) distinguishes between actionable and nonactionable conduct:

> Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

As Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002) observes, the latter type of conduct "generally does not create a work environment that a reasonable person would find intolerable," and "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment."

For present purposes it does not matter whether a factfinding jury could reasonably find the sexually suggestive work products created and circulated by a concededly boorish Buongiorno fell on the wrong side of the divide, let alone qualify in the terms classically (and famously) expressed by the late Justice Potter Stewart, concurring in Jacobellis v. Ohio, 378 U.S. 184, 197 (1964):

> I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [hard-core pornography]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it....

For even if a jury were to find that conduct (though a single,

10

albeit repeated, act) sufficed to render Czemske's work environment objectively hostile, she cannot survive summary judgment because Kodak was not negligent in addressing Czemske's complaint.

In that respect Kodak argues that it is entitled to the affirmative defense established in <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) (K. Mem. 4-11). Not so--<u>Burlington</u>, 524 U.S. at 765 instructs that the affirmative defense is relevant in quite different circumstances: situations where sexually harassing conduct, but no tangible employment action, is undertaken by "a supervisor with immediate (or successively higher) authority over the employee" -- conduct that could subject the employer to vicarious liability. And <u>Faragher</u> also dealt with sexual harassment by a supervisor.

By contrast, <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d 1027, 1035 (7th Cir. 1998) sets forth the standard that applies when, as here, a co-worker is the harasser:

> [E]mployers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment.

Because Buongiorno was not Czemske's supervisor, Kodak is potentially liable only if it was negligent in responding to her complaint. As <u>Tutman v. WBBM-TV, Inc./CBS, Inc.</u>, 209 F.3d 1044, 1048 (7th Cir. 2000) teaches:

11

> In hostile work environment cases, the employer can
> avoid liability for its employees' harassment if it
> takes prompt and appropriate corrective action
> reasonably likely to prevent the harassment from
> recurring.

Kodak's sexual harassment policy, which Czemske received (K. St. ¶52), provides that harassed employees should "immediately report" incidents of sexual harassment to any one of a number of individuals, including supervisors (id. ¶53; K. Ex. E). As indicated earlier, Czemske contends (and this opinion therefore credits for summary judgment purposes) that Broderick initially saw the two images in 1998 (C. Resp. St. ¶41; C. St. ¶2). But Kodak's obligations under the law were not triggered at that time, because Czemske herself did not pursue a complaint based on what she then viewed as an isolated incident.

Focusing on the 2000 events that did lead to Czemske's formal complaint, she contends that both Broderick and Griffith had the requisite notice when they saw K. Ex. F on April 3 (C. Mem. 4 and 7). But because "'the law against sexual harassment is not self-enforcing' and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists" (Parkins, 163 F.3d at 1038, quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1014 (7th Cir. 1997)), Kodak is more appropriately viewed as having received notice of the type that called for an appropriate response on its part on April 17, when Czemske followed Kodak's

12

sexual harassment policy and met with her supervisor.

And there is no question that as soon as Kodak had such notice of the harassment it took reasonable, prompt and effective corrective action.[12] Broderick decided to terminate Buongiorno's employment on April 20 and notified Buongiorno of his termination on April 24. Terminating Buongiorno was undeniably the most effective means of preventing further harassment. Czemske points to no real delay or unreasonableness in Kodak's remedial conduct. Hence Kodak has discharged its legal duty by taking effective remedial action as soon as Czemske complained to it about Buongiorno's conduct (see Johnson v. ITT Aerospace/Communications Div. of ITT Indus., Inc., 272 F.3d 498, 500 (7th Cir. 2001)).

Constructive Discharge

Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 877 (7th Cir. 1999)(internal quotation marks and citations omitted) sets forth the two-step process for establishing constructive discharge:

> First, a plaintiff needs to show that his working conditions were so intolerable that a reasonable person would have been compelled to resign. Second, the conditions must be intolerable because of unlawful discrimination.

---

[12] Indeed, even if the April 3 date were viewed as somehow putting Kodak on notice of the disturbing conduct even though Czemske had not yet complained about it, the immediacy of the Kodak response when she did complain met its obligations imposed by law.

13

And Tutman, 209 F.3d at 1050 (internal quotation marks and citation omitted) further instructs:

> Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress.

Because Czemske has failed to show that her work environment was hostile or abusive, by definition she cannot surmount the higher hurdle posed by her constructive discharge claim. Instead of remaining at Kodak while it pursued the remedial course, Czemske resigned even though Griffith told her that he would immediately address the issue. Czemske has simply failed to raise any reasonable inference that her working conditions were so intolerable that a reasonable person would have been compelled to resign.

## Conclusion

There is no genuine issue of material fact as to either of Czemske's claims--that relating to an assertedly hostile work environment or that asserting her constructive discharge. Because Kodak is therefore entitled to a judgment as a matter of law, its Rule 56 motion is granted and this action is dismissed.

/s/ Milton I. Shadur
Milton I. Shadur
Senior United States District Judge

Date: June 16, 2003

14